No. 12,905.

SUCCESSION OF ROBERT MANSON.

SYLLABUS.

1. The effect of the Registry laws is not so potent as to necessarily vest in a minor a legal mortgage on certain property standing on the records in the name of his natural tutor, when, in point of fact it had never belonged to him; he had not assumed ownership over it, but had, *ab initio*, in the only instrument connecting him with the title, recognized the property to belong to another person.

2. The mortgage in favor of minors upon the property of their natural tutors to secure the fidelity of the tutors' administration, is created by the law and not the convention of parties. It is declared by the law to attach to the property of the tutors not that apparently belonging to them. There may be cases where the mortgage would attach to property so circumstanced, but there are others where the mortgage should not be made to extend beyond the exact terms of the law.

Succession of Robert Manson.

O N APPEAL from the Civil District Court for the Parish of Orleans. *Monroe, J.*

*Harry H. Hall* for Whitney National Bank, Plaintiff in Rule, Appellee.

*Buck, Walshe & Buck* and *S. L. Gilmore* for Undertutor of the minor, Olive Manson, Defendant in Rule, Appellant.

Argued and Submitted December 7, 1898.
Opinion handed down January 23, 1899.

### STATEMENT OF THE CASE.

The opinion of the court was delivered by

NICHOLLS, C. J. The Whitney National Bank took a rule in this case on Mrs. Lizzie D. Oliver, widow of Robert Manson, and now wife of James M. Pagaud, natural tutrix of her minor child, Olive Manson, on James M. Pagaud, tutor, and James J. Manson, undertutor, to show cause why the general mortgage resulting from the co-tutorship of the minors, to secure the sum of eighty-three thousand two hundred and thirteen dollars and fifty-four cents, as per certificate of the clerk of the Civil District Court, dated April 5, 1897, recorded in the mortgage office on the 5th day of April, 1897, in book 489, folio 604, should not be cancelled and erased insofar as it rests upon or affects the following property:

"Two certain lots of ground, together with the buildings and improvements thereon, and all the rights, ways, privileges, servitudes and advantages thereunto appertaining and belonging, situated in the Sixth District of this city, designated by the Nos. 1 and 2 of square No. 23 on the original plan of the Fauborg Plaisance, bounded by Carondelet, Baronne, Delachaise and Louisiana avenue, and measuring each thirty feet front on Louisiana avenue, by a depth of one

hundred and twenty-eight feet between parallel lines; lot No. 1 form-
ing the corner of Louisiana avenue and Carondelet street," for the
following reasons:

That on the 17th of June the Whitney National Bank paid to
William G. Mitchell the sum of five thousand dollars, payable in
thirty days after date, to secure which sum Mitchell pledged to the
bank his mortgage note, dated December 16, 1892, payable in one year
from that date for five thousand dollars, the note being identified with
an act before J. C. Wenck, notary public, of the same date, and by
which Mitchell mortgaged and hypothecated the above described
property in favor of Frank W. Ellerman, or any future holder to
secure the note.

That on the 28th of October, 1897, the bank, in the absence of its
regular attorneys, handed to the above counsel the mortgage note,
requesting him to have executory process issue upon the same. That
the counsel, aware of the absence of said directors of the bank from
the city, and without being instructed by the president of the bank,
but acting on his own motion, and solely for the purpose of more con-
necessary to bid it in at the sheriff's sale of the property, bid it in in
the name of James M. Pagaud, who was the cashier of the bank, and
had the Civil Sheriff of the parish of Orleans make title to him on
the 23d of December, 1897.

That said counsel was not informed, and did not know of the
minor's mortgage against James M. Pagaud, nor of its inscription
against the property. That Pagaud is, and was at the time, cashier of
the bank, but never had, nor had he any interest, direct or indirect,
in either of the notes nor in the property, nor in the bank's mortgage
which rested upon it.

That, as a precautionary measure against the death of Pagaud, a
counter letter was duly executed by him at the time of sale, and
delivered to the bank, recognizing the bank as the sole owner of the
property.

That upon the bank finding a purchaser for the property the certifi-
cate of mortgage requested by the purchaser showed an inscription of
the minor's general mortgage against the property.

That, as the property never belonged to Pagaud, who never had, or
has now, the least right, title or interest in or to the same, it belong-
ing solely or exclusively to the bank, it was obvious the minor's

mortgage was not legally attached to the property, merely because it happened to be temporarily in the possession of the co-tutor.

After hearing, the lower court rendered judgment making the rule absolute, and directing the recorder of mortgages for the parish of Orleans to erase and cancel the mortgage above referred to.

The defendants, in rule, thereupon took an appeal to this court.

The evidence shows that in October, 1897, the Whitney National Bank was the owner of a certain promissory note for five thousand dollars, made and subscribed by W. G. Mitchell, to his own order, and by himself endorsed, dated December 18, 1892, and payable one year after date, which note was secured by special mortgage on certain property in the city of New Orleans. That on the 16th of October, 1897, this note and mortgage being still owned by the bank, were handed by Mr. Whitney, one of its directors, to H. H. Hall, Esq., attorney at law, for foreclosure, the regular attorney of the bank being absent at that time. That Mr. Hall instituted proceedings by way of executory process against the property in the name of James M. Pagaud (who was then cashier of the bank) instead of in the name of the bank itself. That these proceedings culminated in a judicial sale on the 23d of December, 1897, at which the Civil Sheriff adjudicated the property to Harry H. Hall for account of James M. Pagaud, as being the last and highest bidder. That a sheriff's deed of the property was executed by the sheriff on the 7th of January, 1898, and was recorded on the same day in the conveyance office of the city of New Orleans. That in the meantime, on the very day of the adjudication (23d December, 1897), Mr. Pagaud signed an instrument in which he declared that "whereas, at a sale made on the 23d day of December, 1897, in the suit of James M. Pagaud vs. W. G. Mitchell, he, Pagaud, plaintiff in said suit, became the adjudicatee and pur-chaser of certain property which he described (being the property mortgaged to secure the debt, and seized and sold to pay the same). Now, therefore, he, the said Pagaud, thereby acknowledged in the presence of the undersigned witnesses that he had purchased· said property and held the same for the account of the Whitney National Bank, of New Orleans, and he thereby bound himself to make it a deed and transfer of the same without further consideration when-ever thereto requested. This act was signed by C. S. West and Geo. Q. Whitney, as witnesses, and was acknowledged by Pagaud on the

18th of January, 1897, before A. C. Lapice, notary. It does not appear to have been recorded.

The sheriff's deed was signed by Frank Marquez, Civil Sheriff, in the presence of Ernest Ricker and C H. Baudeau, as witnesses, but was signed by neither Hall nor Pagaud.

The bank having found a purchaser for the property, the recorder of mortgages, at the instance of parties, furnished a certificate of the mortgages affecting the property in the name of James M. Pagaud, from which it appeared that it was affected by general mortgage to secure eighty-three thousand two hundred and thirteen dollars in favor of his step-daughter, the minor, Olive Manson, resulting from James M. Pagaud's being co-tutor with his wife of said minor Olive Manson, said mortgage dating from the 5th of April, 1897.

Upon ascertaining this fact, the Whitney Bank took out the rule against Mrs. Lizzie D. Oliver, wife of James M. Pagaud, James M. Pagaud, co-tutor, and James J. Manson, undertutor, of the minor, from the judgment upon which rule this appeal was taken.

The bank propounded interrogatories on facts and articles to James M. Pagaud and his wife, who answered the same under oath, declaring that neither the minor, Olive Manson, nor the succession of Robert Manson, nor Mrs. James M. Pagaud, had then, or ever had, the slightest interest, right, title, or ownership, in or to said property, or any claim against the same. That true it was the adjudication of the property was made to James M. Pagaud, cashier of the Whitney National Bank, but it was simply as a matter of convenience for account of such bank, and James M. Pagaud had not then, nor had he ever had in the said property, any claim thereto, nor the slightest interest in and to the notes, by virtue of which said property was sold, said notes having belonged exclusively to the Whitney National Bank.

Mr. Hall testified that the note and mortgage which were foreclosed were handed to him for that purpose; that he caused executory process to issue. That he was informed that the Board of Directors of the bank did not have a *quorum* by reason of the fever prevailing in New Orleans; that when the property was adjudicated he, of his own motion, simply as a matter of convenience, and acting solely as the attorney of the bank, the only party in interest, bid in the property in the name of James M. Pagaud, who was the cashier of the bank.

That the title should have been made to the bank, and would have

beeu made to the bank, but he thought the lack of a *quorum* might throw an obstacle in the way of a prompt sale; that he expected to be able to transfer the property from the bank to a Mr. Fisher as soon as it had title; that he was not, of course, aware that any judgment or mortgages of any kind were recorded against Mr. Pagaud, nor did Mr. Pagaud mention the matter to him; that Mr. Pagaud had no individual interest of any kind whatever either in the notes in question nor in the property; nor did he (Mr. Hall) represent Mr. Pagaud. That the entire matter was entrusted to him (Mr. Hall) by the Whitney National Bank, the sole party in interest, and he acted exclusively for the bank; that he did not consult the Whitney National Bank in this adjudication. James M. Pagaud, on the stand as an ordinary witness, testified that the note which was foreclosed belonged to the Whitney National Bank; that it was given to it by Mitchell for a loan of money to him; that he (Pagaud) had no interest in the note; that he was not aware, at the time, of the adjudication of the property to him, that the property was to be placed in his name; that he heard of it afterward; that he had no interest whatever in this transaction from beginning to end, nor in the property purchased.

Mr. Hayden, president of the Whitney National Bank, stated that on the 17th of June, 1896, the Whitney National Bank loaned W. G. Mitchell five thousand dollars, and to secure said loan he pledged to the bank the promissory note in question; that James M. Pagaud had no interest whatever in it, or in the property, directly or indirectly; that at the time of the foreclosure of the mortgage the yellow fever was prevailing in New Orleans, and all the directors of the bank were absent but one or two; that there was not a *quorum* in the city; that the Board of Directors had no meeting at that time; it was impossible.

The evidence is conclusive that at no time had James M. Pagaud, in point of fact, an interest either in the note foreclosed upon in the suit of Pagaud vs. Mitchell, or in the property which was judicially sold in the suit, though the title to the same was, by direction of Mr. Hall, placed in his name. Mr. Pagaud was not aware, when the adjudication was made, that it was proposed to make him appear as adjudicatee, and on the very day of the adjudication, and before the sheriff's deed was made out or recorded, he had signed an instrument in which he explicitly stated that though the title was in his name, he held it for account of the bank.

Mr. Hall was not authorized by the bank to institute proceedings in the name of Mr. Pagaud, nor authorized to place the property in Mr. Pagaud's name, either by the Whitney National Bank or by Mr. Pagaud himself. The sheriff's deed was not signed by Mr. Pagaud, and there is no evidence anywhere connecting him (to this day) with the adjudication besides the recitals of the deed to which he was not a party other than the counter letter which, while recognizing that the title had been taken in his name, in the very same instrument disclosed that he had never been the owner of the property, but that he held it for account of the Whitney Bank.

He never consented to be the owner of the property, or to incur the liability on his part, which would have resulted had he become the adjudicatee at the judicial sale. Had any one caused the counter letter to have been recorded, with a view of attempting to show a written consent by Mr. Pagaud of Mr. Hall's action, the instrument would show a disclaimer of title, and not an acceptance of ownership or ratification of the adjudication as made.

At all events the first and only act of Mr. Pagaud himself connecting him with the transaction would, while showing the placing the title in his name, disclose simultaneously that he was not and had not been the owner (Gaillard vs. Nicholas, 9 An. 176). Had the Whitney Bank, on ascertaining that the adjudication had been made in the name of Pagaud, called upon him for the price, and he had refused to pay, denying the authority of Mr. Hall to act for him in making the purchase, and refusing to take any action whatever in respect to the matter, and thereupon the bank had instituted a suit against him (making the tutor and co-tutor and undertutor of the minor, Olive Manson, parties), alleging that he had never paid the purchase price and disclaimed ownership under the adjudication, and had prayed, in view of the promises, that the adjudication be decreed to have been to the Whitney Bank, and that Pagaud was not the adjudicatee, and had never had any interest in the property, and had the court rendered a decree as prayed for, we think that that portion of the decree which declared that Pagaud was not the adjudicatee, and that he had never had any interest in the property, would have effectually barred and disposed of any claim made for or in behalf of the minor, Olive Manson, that the property was struck by the general mortgages in favor of that minor, securing the faithful administration of her property by her mother as natural tutor, and her step-father,

Pagaud, as co-tutor, by reason of the fact that the title had stood registered under such circumstances in the name of Pagaud. The effect of the mere registry would not have been so potent as to vest in her a mortgage, when in point of fact the property had never belonged to the co-tutor, and he not only had never assumed ownership in it, but had, ab initio, recognized the property as belonging to the bank. This suit, though not precisely in that form, is one substantially to the same effect.

The undertutor contends that, under the decision in Life Association of America vs. Hall, 33 An. 49, the minor's mortgage can not be removed in the manner attempted here; that it can only be removed by the giving of a special mortgage to the minor on other property.

The decision in that case has no bearing in this.

We are not dealing now with a case where a mortgage existing in point of fact, in favor of a mortgagee, an attempt is being made to get rid of it, but with one where it is denied that the mortgage ever had any existence at all, and the prayer is for a decree to that effect.

The undertutor further claims that actual ownership in property is not essential to the existence of a mortgage against it in the name of the person in whose name it stands registered. That if a person places property in the name of another, or permits him to appear on the public records as owner when he is not the actual owner, he is estopped from claiming ownership as against parties who have dealt in good faith with the apparent owner on the strength of the public records; that the apparent must be taken for all legal purposes as the actual owner. That when registry is once made in the name of a merely apparent owner, and rights spring into existence from that state of facts, counter letters acknowledging the actual facts avail nothing against them. He cites Article 2239 of the Civil Code which declares that "counter letters can have no effect against creditors or bona fide purchasers; they are valid as to all others," and he refers the court to Bach vs. Abbott, 6 An. 809, and to Stockton vs. Craddick, 4 An. 282.

There is no question that if the actual owner places the title of his property in that of another person, and permits property actually his to stand on the records as that of another person, he must respect the rights of parties who have dealt in good faith with the apparent owner on the faith of the public records, and by reason of a condition of things superinduced or permitted by himself, and that whatever rights

he has, must be subordinated to those of those innocent third parties. (Mercier vs. Canonge, 8 An. 37), and there is no doubt that if this situation exists, it can not be undone by means of counter letters subsequently placed on record (Stewart vs. Newton, 12 An. 622—Succession of Tabary, 31 An. 415). But this case is presented to us under an exceptional state of facts and exceptional conditions, and also freed from all questions of fraud or wrong doing, the good faith of all parties being conceded.

There is no doubt that if the Whitney Bank should permit the title to this property to remain on the records as that of Pagaud, and he should sell or conventionally mortgage the same as his property to parties dealing *bona fide* with him as owner, that such sale or such mortgage would prevail over any rights of the bank. So, also, if parties should enter into contracts with Pagaud, dealing with him in making the same on the strength of the real property supposed to be owned by him by reason of the public records, and these parties should obtain judgments and record them prior to the recording of counter letter; that these judicial mortgages would prime the rights of the bank; but neither this minor, nor any one acting in her behalf, has dealt with Pagaud on the strength of the records, showing the latter to be the ostensible owner of the property. The mother of the minor was entitled, absolutely, to be confirmed her natural tutrix without reference to any question as to whether she had, or had not, property. The subsequent marriage of Pagaud with the mother of the minor carried with it, as a consequence, his co-tutorship of his step-daughter. The tutorship and the co-tutorship preceded by a number of months the judicial sale made in the proceedings against Mitchell, and therefore no action of any kind touching the minor's interests was in point of fact predicated upon Pagaud's being the owner of the property. If the minor's mortgage were to attach, it would not be by reason of any equities in favor of the minor, but by reason of the court's holding, that the registry law carried with it the attaching of the mortgage as the inexorable and unavoidable consequence *ipso facto* of the fact of the registry of the adjudication in the name of Pagaud, independently of any question as to whether he was actually the owner or not; whether the adjudication made to him had been so made either with his knowledge and consent, or with that of the seizing creditor, and regardless of any special facts or circumstances connected with the transaction. We are not prepared to give to the registry laws the

sweeping effect contended for. The mortgage in favor of minors is not the result of contracts or dealings of parties with each other. It is created and given by the law itself. By Article 3314 of the Civil Code it is declared that minors have a legal mortgage on the property of their tutors as a security for their administration, and by Article 322 of the Civil Code that "the recording of the tutor's bond, or the certificate of the clerk, which the law requires in the case of the appointment of tutor, operates as a legal mortgage in favor of the minor for the amount therein stated on all the immovable property of the tutor."

The object fixed by the law, as that to be affected by this mortgage, is not property apparently belonging to the tutor, but "the property of the tutor." (Broussard vs. Sheriff, 44 An. 883.)

There may be cases where property apparently belonging to tutors would and should be properly charged with such a mortgage, but there are others where, by reason of their special facts, the law should not be extended beyond its exact terms, and where the situation should be confined to the property designated by itself as to be affected; that is, to the property actually belonging to the tutor, and we think the present to be one of such cases. It would be unjust and inequitable, under the circumstances developed by the evidence, to hold this property to have ever been affected by the minor's mortgage.

For the reasons assigned, it is hereby ordered, adjudged and decreed, that the judgment appealed from be affirmed.